SKS MERCH, LLC., and Toby Keith Covel, d/b/a Toby Keith, Plaintiffs,

v.

Mike BARRY, Lou Black, Louie Cutone, Various John Does and Various Jane Does, Defendants.

No. CIV.A. 02–516–KSF.

United States District Court, E.D. Kentucky, Lexington Division.

Dec. 5, 2002.

Thomas W. Miller, Carroll M. Redford, III, Elizabeth C. Woodford, Miller, Griffin & Marks, P.S.C., Lexington, KY, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER

FORESTER, District Judge.

This matter is before the Court on the Plaintiffs' Motions for a nationwide Preliminary Injunction and a Permanent Injunc-

tion (Docket No. _____). Having reviewed the pleadings in this matter, and having considered the arguments of counsel, the Court will grant both Motions for the reasons set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Toby Keith Covel, d/b/a Toby Keith ("Keith"), is a country music recording artist and performer. Plaintiff SKS is a Tennessee limited liability company. Authorized by Keith, SKS manufactures, markets and sells t-shirts, hats, and other merchandise bearing Keith's name, photograph, logo, likeness, tour information, and/or image, or which is otherwise associated with Keith's music career. SKS sells the merchandise at Keith's concerts throughout the country; SKS's primary focus is the sale of this concert merchandise, which is unique from other authorized Toby Keith merchandise. SKS remits taxes in each venue in which the merchandise is sold. In many venues, a license is required (and properly obtained) in order for SKS to lawfully sell its merchandise.

As explained by the Affidavit and testimony of Billy Ray Eden ("Eden"), an SKS representative, "bootleggers" have sold and continue to sell unauthorized, unlicensed versions of t-shirts, hats, and other merchandise bearing Keith's name, photograph, logo, likeness, tour information, and/or image. This "bootlegged" merchandise is sold without any authorization or license from SKS or Keith. The bootleggers appear at successive concerts, essentially following Keith on his nationwide concert tour and to other performances. Mr. Eden's Affidavit and testimony explains that bootlegging activities have occurred during concerts in seven (7) different states. The Affidavit details multiple instances of bootlegging at eleven (11) separate Keith concerts, while Mr. Eden's testimony also addressed bootlegging activity at a recent Keith performance in Greenville, South Carolina. Mr. Eden also testified that, at Keith's concert in Ypsilanti, Michigan, on October 17, 2002, Robert P. Conderato ("Conderato") was charged with bootlegging activity. Conderato was observed by a law enforcement officer selling t-shirts featuring Keith's logo. Conderato conceded that he did not have a license or any authorization from SKS to sell the t-shirts. Moreover, the bootleg t-shirts have also appeared on eBay, an internet auction site.

Mr. Eden's testimony also established the difficulty confronted by SKS in obtaining the names and addresses of the bootleg vendors who appear at Keith's concerts and performances. Typically, the bootleg vendors disappear before SKS employees can find them, confiscate their goods, or question them regarding their names and addresses. SKS employees have managed to identify at least some of the bootleggers: named Defendants Mike Barry, Lou Black, and Louie Cutone. At a hearing on the pending Motions, the Plaintiffs produced photographs depicting various persons allegedly engaged in selling bootleg merchandise at and around Keith's concerts. The photographs evidence the Plaintiffs' ongoing but ultimately futile efforts to identify and stop the bootleg vendors.

Mr. Eden also testified that he and other members of the SKS staff have been subjected to threats of violence by the bootleg vendors. Local law enforcement officers in the areas in which Keith performs routinely advise SKS that they will make no effort to identify the bootleg vendors, seize the bootleg merchandise, or charge the vendors with any offense or violation unless the Plaintiffs have an injunction issued by a federal court prohibiting the sale of the bootleg merchandise. Having lacked such an injunction, the Plaintiffs have been unable to consistently persuade local law enforcement to aid

them in any predictable way in their attempt to prevent the bootlegging activity at and around Keith's concerts.

Because of its inability to thwart the bootleggers without intervention by a federal court, the Plaintiffs filed a Complaint on November 19, 2002, alleging violations of the Lanham Act, 15 U.S.C. § 1051, et seq., by the named and unnamed Defendants. The Plaintiffs also sought a Temporary Restraining Order and a Preliminary Injunction. After a hearing on November 19, 2002, the Court granted the Plaintiffs' request for a Temporary Restraining Order. The Order enjoined the named and unnamed Defendants from selling or offering to sell t-shirts, hats, and other merchandise bearing the photograph, likeness, image, and/or logo of Keith without the Plaintiffs' authorization within a 25–mile radius of Keith's November 23, 2002, performance in Lexington, Kentucky. The Order further authorized law enforcement officers to seize any such merchandise. The Order provided that it, as well as related pleadings, would be served upon the Defendants when and if law enforcement or the Plaintiffs observed the sale of bootleg merchandise. The Temporary Restraining Order was secured by a $500 bond by the Plaintiffs and was set to expire within ten (10) days of its issuance. The Temporary Restraining Order also scheduled a hearing on the Plaintiffs' Motion for a Preliminary Injunction for November 27, 2002.

The Plaintiffs then filed a renewed Motion for a nationwide Preliminary Injunction, as well as a Motion for a Permanent Injunction pertaining to the Eastern District of Kentucky.

Although no bootleg vendors were identified during Keith's November 23, 2002, performance in Lexington, Kentucky, the ongoing and pervasive nature of the boot-legging activity at and around Keith's performances was established by Mr. Eden's Affidavit and his testimony at the November 27, 2002, hearing. At that hearing, the Plaintiffs produced numerous examples of authorized and unauthorized Toby Keith merchandise. The unauthorized merchandise, sold by bootleg vendors, apparently includes t-shirts with torn tags, an indication of poor quality. Some bootleg t-shirts bear erroneous concert dates. Although the bootleg versions are of poorer quality and contain minor inaccuracies, the images and logos printed on the unauthorized merchandise are essentially identical, or at least substantially similar, to those printed on the authorized merchandise.

At the hearing, Mr. Eden explained the difficulty in quantifying and recovering the profits lost by SKS due to the bootleg activity. Because the bootleg vendors flee when approached by the Plaintiffs, the exact number and price of the unauthorized, unlicensed t-shirts, hats, and other merchandise cannot be calculated. Even if such a calculation were possible, the bootleg vendors' refusal to identify themselves or provide addresses make any recovery by the Plaintiffs almost impossible.

## LEGAL ANALYSIS

**I. THE PLAINTIFFS ARE ENTITLED TO A NATIONWIDE PRELIMINARY INJUNCTION RESTRAINING THE SALE OF UNAUTHORIZED, UNLICENSED MERCHANDISE BEARING KEITH'S NAME, LIKENESS, PHOTOGRAPH, TOUR INFORMATION, AND/OR IMAGE**

**A. The Plaintiffs Satisfy Each Prerequisite for the Issuance of a Preliminary Injunction**

A motion for a preliminary injunction requires this Court to consider and balance four factors:

(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others [and balancing the harm to the moving party if the injunction is denied against the harm to others if the injunction is granted]; and (4) whether the public interest would be served by the issuance of the injunction.

*Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir.1997). Although the factors are to be balanced against each other, each factor need not be satisfied to issue a preliminary injunction. *Franklin Jefferson, Ltd. v. City of Columbus*, 211 F.Supp.2d 954, 957 (S.D.Ohio 2002).

■ As explained below, the Court finds that the Plaintiffs have satisfied each factor relevant to the issuance of a preliminary injunction. The Court also notes, however, that irreparable harm is often presumed when a preliminary injunction is requested to enjoin a violation of the Lanham Act. "Simply fulfilling the requirements of the statute or, in other words, fulfilling the first factor for an injunction to issue—showing a strong likelihood of success on the merits—is all that is needed for the Court to issue an injunction." *Microsoft Corp. v. Action Software*, 136 F.Supp.2d 735, 739 (N.D.Ohio 2001). *See also U.S. v. Painesville*, 644 F.2d 1186, 1194 (6th Cir.1981) (holding that district court must, under a statutory injunction, order injunctive relief upon finding of liability without considering irreparable harm). Thus, in the context of a Lanham Act claim, a showing of likelihood of confusion as to sponsorship, approval, or association will itself establish the requisite likelihood of success on the merits and a risk of irreparable harm. *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir.1982).

The Court finds that the Plaintiffs satisfy each prerequisite for the issuance of a nationwide Preliminary Injunction enjoining the unauthorized sale of merchandise bearing Keith's name, photograph, logo, likeness, tour information, and/or image.

1. *The Plaintiffs are likely to succeed on the merits of their Lanham Act claim*

■ The Plaintiffs have demonstrated a strong likelihood that they will succeed on the merits of their Lanham Act claim against the named and unnamed Defendants. The Lanham Act generally prohibits the unauthorized sale of merchandise bearing Keith's photograph, image, name, likeness, and/or logo. Section 1125(a) states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

The testimony and evidence offered by the Plaintiffs establishes that the sale of bootleg merchandise associated with Keith is a consistent and pervasive problem throughout the nation. A strong likelihood exists that the Defendants have sold and

will continue to sell merchandise bearing Keith's name, photograph, image, likeness, tour information, and/or logo which has not been authorized or licensed by the Plaintiffs. For example, Mr. Eden testified that SKS obtained forty-eight (48) t-shirts from bootleg vendors at Keith's November 22, 2002, performance in Greenville, South Carolina.[1] The bootleggers who routinely appear at and around Keith's performances often sell their unauthorized merchandise from parking lots and exit ramps. The Defendants, both named and unnamed, scatter when questioned by SKS employees. Such conduct is hardly consistent with vendors of authorized, licensed merchandise. The Defendants' pattern of conduct establishes a strong likelihood that the bootleg activities will continue throughout Keith's 2003 performance tour.

The Defendants have misappropriated Keith's name, photograph, likeness, and image without authorization or license from the Plaintiffs. Because it appears to be nearly identical to the licensed, authorized merchandise, the bootleg merchandise clearly causes a likelihood of confusion as to Keith's association with and sponsorship and approval of that merchandise. Although the Defendants' outright misappropriation of the Plaintiffs' merchandise designs may make such an analysis unnecessary,[2] the Plaintiffs have satisfied the test set forth in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir.1982), for determining whether a defendant's goods cause a likelihood of confusion under the Lanham Act.

*Frisch's* set forth eight (8) factors which should be considered:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Id.* at 648. However, as the Sixth Circuit recently observed in *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir.1988):

These factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.

*Id.* at 1186.

The Plaintiffs have satisfied the *Frisch's* factors and have established a likelihood of success on the merits of their Lanham Act claim. The Plaintiffs' mark is obviously strong: the t-shirts and other merchandise legitimately sold by the Plaintiffs feature distinctive photographs and images of Keith and his logos and tour information. The goods sold by both parties are clearly related: both the Plaintiffs and the Defendants sell t-shirts, hats and other merchan-

---

**1.** The Greenville, South Carolina, performance occurred on the night prior to the above-discussed Lexington, Kentucky, performance.

**2.** The Defendants have blatantly misappropriated Keith's name, photograph, likeness, and image without authorization or license from the Plaintiffs. Except for minor inaccuracies and inferior in quality, the Defendant's merchandise is the same as that sold by the Plain-

tiffs. This would appear to dispose of any requirement that the Plaintiffs satisfy the *Frisch's* test to establish a likelihood of confusion. This Court need not determine whether the Plaintiffs are required to meet that test, however, because the testimony and evidence produced by the Plaintiffs easily satisfies the *Frisch's* elements. Moreover, the named and unnamed Defendants are, quite simply, thieves.

dise bearing Keith's name, photograph, likeness, tour information, and/or image, as evidenced by the t-shirts produced at the hearing.[3] The Defendants' bootleg merchandise is unmistakably similar to the Plaintiffs legitimate merchandise. Mr. Eden's testimony established that actual confusion has resulted from the sale of the bootleg merchandise. Many of Keith's fans reported to SKS that they believed the bootleg merchandise to be "official" Keith merchandise. Both parties almost exclusively use the marketing channels made available at and around Keith's performances. Finally, the merchandise sold by both parties will expand at a concurrent rate, as Keith's career and performances continue.

The most critical *Frisch's* factor is the defendant's intent. If the defendant's mark "was adopted with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Frisch's Restaurants,* 670 F.2d at 648. In other words,

> [A] defendant who purposely chooses a particular mark because it is similar to that of a senior user [the plaintiff] is saying, in effect, that he thinks that there is at least a possibility that he can divert some business from the senior user—and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact.

*Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir. 1987). Direct testimony is not necessary to establish wrongful intent; instead, the defendant's intent may be inferred from the defendant's acts. *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983).

Here, the Defendants' intent is obvious: the Defendants intend to derive a benefit from Keith's reputation and performances. Otherwise, the Defendants would not sell t-shirts and other merchandise which so closely resemble the merchandise sold by the Plaintiffs or which makes use of Keith's likeness, image, photograph, logos, and/or tour information. This fact alone establishes a likelihood of confusion and, correspondingly, the Plaintiffs' likelihood of success on the merits of their Lanham Act claim.

### 2. The Plaintiffs will suffer irreparable harm absent the issuance of a nationwide preliminary injunction

As explained above, irreparable harm may be presumed from a finding of a likelihood of confusion as to the Plaintiffs' sponsorship and approval of and association with the merchandise sold by the Defendants. However, the Plaintiffs have independently established that they will be irreparably harmed absent an Preliminary Injunction enjoining the sale of bootleg merchandise related to Keith throughout the nation. Absent such relief, the Defendants' bootleg activity will be permitted to continue unabated, in blatant violation of the Lanham Act. Mr. Eden's testimony established that, in several jurisdictions, law enforcement officers expressly stated that no action would be taken against the bootleg vendors absent an injunctive order from a federal court. Even if SKS could identify all of the bootleg vendors, the Plaintiffs could not recover the damages caused by the bootleg activity. Because the Plaintiffs have no way to ascertain the number of t-shirts or hats sold by the bootleg vendors, they cannot calculate the number of legitimate sales to performance attendees which they lost due to the bootleg vendors' activities. Even if such a calculation could be made, the Defendants'

---

**3.** At the hearing, the Plaintiffs presented to the Court numerous duffel bags and boxes stuffed with bootleg t-shirts which had been seized during recent tour performances.

nomadic nature and refusal to identify themselves would make any collection of damages by the Plaintiffs exceedingly improbable. The Plaintiffs have also been subjected to threats of violence from the unnamed Defendants, hampering their ability to learn the identity and addresses of the bootleg vendors.

No adequate remedy at law exists. The Plaintiffs' rights under the Lanham Act may be protected only by the issuance of a preliminary injunction against the sale of unauthorized merchandise bearing Keith's name, likeness, photograph, logo, tour information, and/or image throughout the country.

3. *The issuance of a nationwide Preliminary Injunction will not cause substantial harm to others*

■ The named and unnamed Defendants who appear at Keith's performances with bootleg merchandise for sale can hardly argue that they will be harmed by an order preventing them from violating the Lanham Act. The bootleg vendors have no conceivable right to continue violating the law. In the event that the Defendants are somehow harmed by the presence of the Preliminary Injunction, the Plaintiffs' bond will compensate them. As further set forth below, this Court is authorized to condition its injunction as equitably appropriate. For example, a preliminary injunction is not binding upon any defendant until and unless it is served with this Court's Order granting the injunction. Additionally, the defendants may be supplied with the Plaintiff's pleadings to date and/or notify the Defendants how to contest any seizure of goods or the existence of the Preliminary Injunction.

4. *The issuance of a Preliminary Injunction will serve the public interest*

■ The issuance of a nationwide Preliminary Injunction will serve the public interest. The public is obviously not served by ongoing violations of the Lanham Act. Further, as established by Mr. Eden's testimony and the t-shirts produced at the November 27, 2002, hearing, the bootleg vendors typically sell inferior and misleading merchandise to often unsuspecting concert attendees who believe they are buying "official" Toby Keith merchandise.

The public interest will also be served by an injunction which ensures the proper licensing and taxation of legitimate vendors of Keith merchandise. Legal vendors of concert merchandise are properly licensed and remit taxes on their sales,[4] while the bootleg vendors are unlicensed and, presumably, remit no taxes.

B. **The Preliminary Injunction Issued to the Plaintiffs Must be Nationwide**

■ This Court is authorized to grant a nationwide preliminary injunction against violations of the Lanham Act. Nationwide injunctions have been issued in connection with performance tours in at least three (3) unreported, unpublished district court cases. *See Lilith Fair Prod. Ltd. v. Various John Does*, No. CV98–749 (D. Or. June 16, 1998); *Winterland Concessions Co. v. Miller*, No. 92–0456 (S.D.Fla. Mar. 2, 1992); and *Winterland Concessions Co. v. Simms*, No. C.C. JRM 95–68 (D.Md. Jan. 17, 1995).

Some district courts have held that nationwide preliminary injunctions are inappropriate in cases involving nationally

---

4. In Lexington, Kentucky, for example, an ordinance prohibits the unlicensed sale of any goods before, during or after "a ticketed Rupp Arena event" in the Lexington Center area. Lexington–Fayette County Code of Ordinances, Sec. 15–1.1. Absent a nationwide Preliminary Injunction, similar ordinances will be violated in numerous jurisdictions.

touring performers. See *Plant v. Does,* 19 F.Supp.2d 1316 (S.D.Fla.1998); *Brockum Co. v. Various John Does,* 685 F.Supp. 476 (E.D.Pa.1988). However, this Court considers *Plant* to be distinguishable from this case. As for *Brockum,* this Court rejects the analysis upon which that opinion was based.

In *Plant,* 19 F.Supp.2d 1316, the court expressed concern regarding its jurisdiction over the unnamed "John Doe" defendants, noting that the plaintiffs had failed to show "that they have engaged in a reasonably diligent search to identify the unknown defendants ...." *Id.* at 1320. The *Plant* plaintiffs apparently could not explain "why they are unable to obtain the identities of these individuals." *Id.* Indeed, the plaintiffs did not even "indicate that they have even ever attempted to ascertain the identity of these individuals." *Id.* In marked contrast, this case does not involve a refusal by the plaintiffs "to expend a modest amount of their ample resources to do a routine preliminary factual investigation before bringing suit in this federal Court." *Id.* Here, Mr. Eden's testimony and the photographs produced at the hearing, as well as the information provided in the Plaintiffs' Supplemental Memorandum, reflect diligent and persistent efforts by the Plaintiffs to obtain the names and addresses of the unnamed Defendants. Clearly aware that they are selling unauthorized merchandise, the vendors flee from the performance sites when SKS staff members approach. Even when the Plaintiffs have managed to learn the names of a few of the bootleg vendors (named Defendants Mike Barry, Lou Black and Louie Cutone), those persons have, for obvious reasons, refused to provide their addresses. The Defendants themselves—not the Plaintiffs—have made identification impossible absent an injunction, which may be easily served upon the vendors when and if they are discovered by the Plaintiffs or law enforcement officials. Further, the *Plant* opinion certainly does not indicate that, at the time of their nationwide injunction request, the plaintiff had suffered from repeated bootleg sales at nearly consecutive performances. Mr. Eden's Affidavit and testimony establish that the Plaintiffs have been subjected to a protracted campaign by bootleg vendors at almost all of Keith's performances.[5]

In *Brockum Co.,* 685 F.Supp. 476, the district court rejected the plaintiffs' request for a nationwide injunction partially by stating that no "procedural means" existed to issue and enforce such an injunction. This Court disagrees. Nationwide injunctions are expressly authorized by the Lanham Act itself, which provides the following procedural mechanism:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent ... a violation under subsection (a), (c), or (d) of section 1125 of this title. Any such

---

5. Mr. Eden's Affidavit reports that bootlegging activities occurred at the following Keith performances: an August 11, 2002, concert in Des Moines, Iowa; an August 23, 2002, concert in St. Louis, Missouri; a September 6, 2002, concert in Atlanta, Georgia; a September 7, 2002, concert in Raleigh, North Carolina; a September 8, 2002, concert in Charlotte, North Carolina; a September 19, 2002, concert in Cincinnati, Ohio; an October 11, 2002, concert in Mountain View, California; an October 12, 2002, concert in Sacramento, California; an October 17, 2002, concert in Ypsilanti, Michigan; an October 18, 2002, concert in Madison, Wisconsin; an October 19, 2002, concert in Saginaw, Michigan; a November 1, 2002, concert in Las Vegas, Nevada; a November 2, 2002, concert in San Bernardino, California; a November 8, 2002, concert in Lafayette, Louisiana; a November 10, 2002, concert in Little Rock, Arkansas; a November 14, 2002, concert in Albany, New York; and a November 22, 2002, concert in Greenville, South Carolina.

injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. *Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found,* and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

*Id.* (emphasis added).

Several federal courts have invoked § 1116 to grant nationwide injunctions against violations of the Lanham Act. In *Golden Door, Inc. v. Odisho,* 437 F.Supp. 956 (N.D.Cal.1977), overruled in part by *Japan Telecom, Inc. v. Japan Telecom America, Inc.,* 287 F.3d 866 (9th Cir. 2002),[6] a plaintiff operated a spa called "The Golden Door" in one part of California. In another area, the defendant opened two beauty salons using the same name. The plaintiff successfully sought a nationwide injunction against the defendant's use of the name, which violated the Lanham Act:

> *Plaintiff's market area, and hence the sphere of its reputation, are nationwide.*

*Accordingly, it is entitled to nationwide protection against confusion and dilution. The scope of the injunction must therefore be nationwide.* Defendants will be permanently enjoined from using the name "Golden Door" or any confusingly similar name in connection with his beauty salons and any future businesses offering hair or beauty care products . . . .

*Id.* at 968 (emphasis added).

Similarly, in *Five Platters, Inc. v. Purdie,* 419 F.Supp. 372 (D.Md.1976), the plaintiffs, owners of the right to use the name "The Platters" in association with a musical group, brought an action against the leader of a singing group which called itself "The Fabulous Platters." Finding a violation of the Lanham Act, the district court issued a nationwide injunction:

> . . . . In view of the peripatetic nature of the two singing groups involved, the injunction should be nationwide in scope. The Lanham Act provides for nationwide enforcement of injunctions . . . The evidence showed that the plaintiff's group has performed and is performing throughout the country both in live appearances and on television and the good will associated with "The Platters" exists in all geographical areas of the United States . . . .

*Id.* at 384.

Like the market area threatened by the *Golden Door* defendants, the market area for the sale of authorized Toby Keith merchandise is obviously nationwide. Mr. Eden's testimony established that Keith's 2003 performance tours will encompass numerous states.[7] Together with Keith's

---

**6.** *Golden Door* was overruled only insofar as it held that a secondary usage need not be proven to show a violation of the California Trade Names Statute. See *Japan Telecom, Inc.,* 287 F.3d 866.

**7.** In 2003, Keith is tentatively scheduled to give performances in the following states: Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Massachusetts, Maine, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire,

2002 schedule, the performance tour will reach nearly every state in the Union. Likewise, the bootleg activities surrounding Keith's performances and career are also nationwide. According to Mr. Eden's Affidavit, bootlegging activity occurred in at least seven (7) states during Keith's 2002 performance season. Bootleg t-shirts are also obtainable on eBay, a nationally accessible internet site. Under *Golden Door* and *Five Platters, Inc.,* a nationwide market and a nationwide reputation compel nationwide injunctive relief.[8]

The concerns articulated by the *Plant* and *Brockum Co.* courts will be resolved by conditions placed on the nationwide Preliminary Injunction.[9] For example, the Preliminary Injunction will apply to an unnamed Defendant only when service is made. The Defendant might also receive copies of the Plaintiffs' pleadings to date, while this Court's Order may advise the Defendant how to challenge the seizure of their goods or the existence of the Preliminary Injunction.

Even in areas beyond the Lanham Act, federal courts are inherently authorized to issue nationwide injunctions. In *Carson v. Here's Johnny Portable Toilets, Inc.,* 810 F.2d 104 (6th Cir.1987), the performer Johnny Carson brought a suit against a corporation engaged in renting and selling portable toilets under the name, "Here's Johnny." Holding that the defendant had violated the plaintiff's state law "right of publicity," the district court enjoined the defendant from using the phrase "Here's Johnny" anywhere in the country. The Sixth Circuit affirmed the issuance of the nationwide injunction. *Id.* at 105. Thus, the possibility that another district court might not reach the same holding in this case is no bar to the issuance of a nationwide injunction. Further, this Preliminary Injunction is based on federal law, not on a state law unique to Kentucky. The principles underlying the Lanham Act and the requirements for a preliminary injunction are the same in all federal jurisdictions.

Indeed, the Federal Rules of Civil Procedure contemplate the issuance of extrajurisdictional injunctions, as well as the reality that those injunctions may affect persons not specifically named in the lawsuit. Fed.R.Civ.P. 65(d) provides that an injunction shall be binding

> only upon the parties to the action ... and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*Id.* Certainly, Rule 65(d) requires actual notice, by service or otherwise, for an unnamed person acting in concert or participation with a named defendant to be bound by an injunction. Actual notice can and will be given when the nationwide injunction is served upon bootleg vendors throughout the country.

---

New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

**8.** Although *The Golden Door* and *Five Platters, Inc.,* involved the improper use of federally registered trademarks, the registration of a trademark or service mark is not a prerequisite for obtaining relief under the Lanham Act. *Security Center, Ltd. v. First Nat. Sec. Centers,* 750 F.2d 1295 (5th Cir.1985).

**9.** Federal courts are inherently authorized to condition injunctions as equitably appropriate. *Salsbury v. U.S.,* 356 F.2d 822 (C.A.D.C. 1966); *Texas Pacific–Missouri Pac. Terminal R.R. of New Orleans v. Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. And Station Emp.,* 232 F.Supp. 33 (E.D.La.1964).

## II THE PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION AGAINST THE SALE OF UNAUTHORIZED TOBY KEITH MERCHANDISE WITHIN THIS JURISDICTION

In addition to a nationwide Preliminary Injunction against the sale of unauthorized merchandise throughout the United States, the Plaintiffs are also entitled to a Permanent Injunction against such sales within the Eastern District of Kentucky.

■ To obtain a permanent injunction, an applicant must establish the following: (1) that it has prevailed on the merits; (2) that it will suffer continuing irreparable harm; (3) that it has no adequate remedy at law. *Buckhorn, Inc. v. Ropak Corp.*, 656 F.Supp. 209, 226 (S.D.Ohio 1987).

■ First, the Plaintiffs have established that they have prevailed on the merits. Mr. Eden's Affidavit and testimony make clear that the named and unnamed Defendants have repeatedly violated the Lanham Act at Keith's past performances. The fact that no unauthorized merchandise was seized during Keith's November 23, 2002, performance does not negate the Plaintiffs' unrefuted and documented allegations regarding the Defendants' past bootlegging activities.

Second, the Plaintiffs will suffer continuing irreparable injury unless a permanent injunction is granted. Mr. Eden testified that Keith is quite likely to give future performances in the Eastern District of Kentucky, and does have a concert tentatively scheduled in 2003. Absent a permanent injunction against the Defendants' bootlegging activities, the Plaintiffs will be forced to reinitiate litigation in this jurisdiction each time Keith performs here.

Finally, as explained above, the Plaintiffs have no adequate remedy at law. Although the Lanham Act provides for the recovery of profits lost by the plaintiff and compensation in the amount of profits earned by the defendant, a monetary recovery is exceedingly unlikely in this case. By scattering when they are discovered, the Defendants prevent the Plaintiffs from calculating the amount of profit lost due to the bootlegging activities. Further, by refusing to provide names or addresses, the Defendants make any collection of damages by the Plaintiffs exceedingly unlikely.

The Plaintiffs are therefore entitled to a Permanent Injunction restraining the sale of unauthorized merchandise bearing Keith's name, likeness, photograph, tour information, and/or image within the Eastern District of Kentucky.

### CONCLUSION

For the reasons stated above, the Plaintiffs' Motion for a nationwide Preliminary Injunction and for a Permanent Injunction pertaining to this jurisdiction shall be granted by separate Orders of this Court, entered on November 27, 2002.

The Order granting the Plaintiffs' Motion for a nationwide Preliminary Injunction shall enjoin the named and unnamed Defendants from selling or offering to sell, without authorization or license from the Plaintiffs, t-shirts, hats, and/or other merchandise bearing the photograph, name, likeness, image, tour information, and/or logo of Plaintiff Toby Keith within the United States. That Order shall further provide as follows:

1. That the Preliminary Injunction shall become binding upon the named and unnamed Defendants upon service of the Order upon them;

2. That the Order and Preliminary Injunction may be enforced by the seizure of any such merchandise and consistent with any other applicable laws or ordinances;

3. That the Order as well as all pleadings filed to date by the Plaintiffs in

this action, shall be served upon any named or unnamed Defendants if and when they are observed by the Plaintiffs or any law enforcement official to be selling or offering to sell t-shirts, hats, and/or other merchandise bearing the photograph, name, likeness, image, tour information, and/or logo of Plaintiff Toby Keith without authorization from the Plaintiffs;

4. That the named and unnamed Defendants served with the Order may challenge the seizure of their merchandise and the existence of the Preliminary Injunction by filing any appropriate pleading in this action; and

5. That the Plaintiffs shall post security in this Court in the amount of $500.00 to secure the Preliminary Injunction.

6. This Order shall not limit the remedies available to the Plaintiffs or to law enforcement officers.

The Order granting the Plaintiffs' Motion for a Permanent Injunction shall enjoin the named and unnamed Defendants from selling or offering to sell t-shirts, hats and/or other merchandise bearing the photograph, name, likeness, image, tour information, and/or logo of Plaintiff Toby Keith within a 25–mile radius of any Toby Keith performance in the Eastern District of Kentucky. The Order shall further provide as follows:

1. That the Permanent Injunction shall become binding upon the named and unnamed Defendants upon service of the Order upon them;

2. That the Permanent Injunction may be enforced by the seizure of any such merchandise and consistent with any other applicable local law or ordinances;

3. That the Order as well as all of the pleadings filed to date by the Plaintiffs in this action shall be served upon any named or unnamed Defendants if and when they are observed by the Plaintiffs or any law enforcement official to be selling or offering to sell t-shirts, hats, and/or other merchandise bearing the photograph, name, likeness, image, tour information, and/or logo of Plaintiff Toby Keith without authorization from the Plaintiffs at or around any Toby Keith performance in the Eastern District of Kentucky;

4. That the Defendants may challenge the seizure of their merchandise and the existence of the Permanent Injunction by filing any appropriate pleading in this action; and

5. That the Plaintiffs shall post security in this Court in the amount of $500.00 to secure the Permanent Injunction.

6. This Order shall not limit the remedies available to the Plaintiffs or to law enforcement officers.

IT IS FURTHER ORDERED that this Memorandum Opinion and Order shall be published.